ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ALETHEA M. SARGENT (CABN 288222)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (510) 637-3924
    FAX: (415) 436-7234
    EMAIL: alethea.sargent@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:21-cr-00181-VC |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| MIN JIN ZHAO, | |
| Defendant. | |

## I.    INTRODUCTION

When his victims knew him, Min Jin Zhao was charismatic and personable. He was also a master manipulator. He worked his way into his victims' lives and then took everything he could from them. His fraud also had a compulsive quality: in February 2021, when victim X.W., believing Zhao to be a Sony executive, wired Zhao $300,000 borrowed from her sister to "invest" in Zhao's "Big Block Consulting, Inc." (hereinafter, "BBC"), he was already on pretrial release in another felony fraud case out of this district involving nearly $800,000 in loss, CR 19-00222-JD. Subsequent to being charged in this case by Complaint and then Indictment in April 2021, Zhao pled guilty in that prior case and was sentenced to a custodial term of 33 months. A Superseding Indictment in this case alleging fraud as to another victim, R.K., was returned in January 2022. Although Zhao's scheme to defraud R.K. began in

2017, well before his indictment in CR 19-00222-JD, multiple of R.K.'s payments to Zhao (including a $50,000 payment) were made subsequent to his indictment in CR 19-00222-JD and prior to his being charged in the instant case.

On February 6, 2023, the defendant pled guilty to the three counts of the Superseding Indictment. This case is now set for sentencing on April 19, 2023. In the plea agreement, the defendant agreed that the appropriate Offense Level was 25, and the Government agreed that it would recommend a sentence at the low-end of the consequent Guidelines range that was concurrent to the sentence already imposed in CR 19-00222-JD. The Government therefore does recommend a sentence of 63 months, to run concurrently with the remainder of Zhao's sentence in CR 19-00222-JD. And the Government contends that the sentence should not be lower than this. Based on the nature of the offense in this case and the defendant's criminal history – and most concerningly that Zhao was on pretrial release for another fraud scheme that involved multiple victims and nearly $800,000 in loss – the Government believes that a sentence of 63 months in custody followed by three years of supervised release is sufficient but is not greater than necessary to achieve the goals set forth in 18 U.S.C. § 3553(a)(2).

## II. OFFENSE AND RELATED CONDUCT

### a) X.W.

In March 2021, the FBI received a tip from D.R., the boyfriend of victim X.W., that Zhao had duped X.W. into a Hollywood investment. PSR ¶ 10.

X.W., who lives in the Bay Area, met Zhao at the Marin Music Festival in approximately 2018. *Id.* Zhao told X.W. that he was a Sony executive. *Id.* In 2021, Zhao reached out to X.W. with an investment opportunity. *Id.* He told her that if she invested $500,000 with Zhao's Big Block Consulting, Inc ("BBC"), she would be an executive producer on BBC's movie projects and receive two percent of BBC's earnings. *Id.*

On February 8, 2021,[1] Zhao, using a "BBCInvestment11@protonmail.com" email address (bearing the identifier "Jean Johnson" with a title of "VP in Investment"), emailed X.W. a movie

---

[1] For reference, case 19-cr-222 JD was indicted on May 9, 2019. After multiple continuances, a plea agreement was entered on July 12, 2021 – three months after this case was filed and a month after Zhao was remanded to custody in the first case. The sentencing took place on November 15, 2021.

2

investment contract for her to review. (*See* Bates MJZ-00017 & MJZ-00031-33); *see also* PSR at ¶ 11. X.W. did not speak English well, so Zhao also provided a Mandarin translation of the contract. *Id.* The contract was a "Film Financing Agreement" representing that "BBC has been established to produce, own and exploit Motion Pictures in 2021 based on the scripts written by award winning script writers (the "Project"), and the Investors desire to invest in and share in the profits of the Projects." *Id.* It also stated that X.W. "hereby agrees to loan the amount of Five Hundreds Thousands ($500,000.00) (the "Loan")" at a six percent annual interest. *Id.*

After many conversations with Zhao, X.W. ultimately entered into the agreement. *Id.* at ¶ 12. X.W. did not have $500,000 so she asked her sister to wire $300,000 to X.W.'s Citibank account ending 9799. *Id.* On February 12, 2021, X.W. wired **$300,000** from her Citibank account ending 9799 to an account at Bank of America ending in 0293, held in the name Big Block Consulting, Inc. *Id.* X.W. had received the wiring instructions from Big Block Consulting and subsequently received an email from "Jean Johnson" on February 12, 2021, confirming the wire transfer. *Id.* The Complaint and original Indictment charged this $300,000 wire, as does the Superseding Indictment.

In February 2021, D.R. traveled with X.W. to meet Zhao at the Waldorf Astoria in Los Angeles. *Id.* at ¶ 13. Zhao attended a dinner with X.W., D.R., and others. *Id.* Zhao told D.R. that Zhao's investors made great returns, that his investors typically roll over their investment to the next movie, and that his investors made anywhere from a 20-26% return on their investments. *Id.* D.R., X.W., and the group became suspicious of Zhao after discussing the investment opportunity with Zhao, and when Zhao claimed he did not have his driver's license after the group requested everyone display their driver's licenses for security purposes at an exclusive party following the dinner. *Id.* D.R. learned about X.W.'s investment after this Los Angeles trip and became concerned. *Id.*

On March 19, 2021, Zhao, X.W., and D.R. spoke on the phone. *Id.* at ¶ 14. X.W. called Zhao at phone number ending in 3101, which is the same cell phone number Zhao used with the victims in his real-estate scheme for which he was previously indicted. *Id.* It is also the same cell phone number identified for Zhao in his pretrial release form in the pending 19-222 criminal matter against him. *Id.* Database records also indicate this is an active AT&T wireless number registered to an individual named MIN ZHAO. *Id.* During the call, D.R. asked Zhao for details about the movie investment,

specifically about investing in the next Spiderman film. *Id.* Zhao claimed that Sony owned 55 percent of the next Spiderman film, and if D.R. was really interested in this specific film, then Zhao would work on trying to cut D.R. into the film's production. *Id.* Zhao offered at the end of the call to send a contract to D.R. *Id.*

Zhao is not a movie executive, and at no time has he been associated with Sony, the Spiderman films, or any other Hollywood venture. *Id.* at ¶ 15; *see also* Plea Agreement ¶ 2(d). Rather, as Zhao admits in the Plea Agreement, these representations were part of a knowing scheme to defraud X.W. out of investment funds. Please Agreement ¶ 2(c).

The Government obtained a seizure warrant for those funds, which resulted in $264,789.07 (of the $300,000) being returned to X.W. By the Plea Agreement, Zhao has agreed that he owes $35,210.93 in restitution to X.W. to compensate her for his theft. Plea Agreement ¶ 9.

### b) R.K.

Separate and apart from X.W., Zhao also defrauded another victim — R.K. — for approximately $2.1 million over the course of several years, between 2017 and 2021. *Id.* at ¶ 16. R.K. lived at the time in Tiburon and was a professional musician. *Id.* Zhao befriended R.K. and convinced her to give him money so that he could invest it for her retirement. *Id.* Similar to above, he told R.K. that he was a Sony Executive. *Id.* He told R.K. that BBC was an investment company and that he would manage her money for retirement purposes through BBC. *Id.* He often took cashier's checks from R.K. purportedly to invest for her. Plea Agreement at ¶ 2(d). In reality, he never invested those funds for R.K.'s retirement. *Id.* Instead, he used that money for his and his then-partner's purposes, including lavish trips and purchasing a residence in Palm Springs. PSR ¶ 16.

R.K. and Zhao met at a birthday party in Petaluma in May of 2014, *id.* at ¶ 17, and, in R.K.'s view, "hit it off immediately." R.K. Victim Impact Statement (hereinafter "R.K. VIS") at 1. Zhao claimed to have an interest in music and started attending musical shows with her. *Id.* R.K. invited Zhao into her life, to the point of introducing him to her mother, her children, and many close personal friends. *Id.* R.K. came to think of Zhao "as family." *Id.* She trusted Zhao. *Id.*

In 2017, after R.K. inherited money from her mother's estate and received additional money in a divorce settlement, *see id.*, Zhao falsely told her that he could invest her money and get an

4

approximately 10% monthly return, Plea Agreement ¶ 2(d).  R.K., who was not a sophisticated investor, did not question Zhao about the "investments" specifically because of her trust in him.  PSR ¶ 14; see also R.K. VIS at 1-2.

Text messages between R.K. and Zhao from 2018 through 2020 reflect the precarious financial position that R.K. found herself in due to Zhao's fraud.  PSR ¶ 18.  Specifically, R.K. on several occasions begged Zhao for her money which he was "investing."  Id.  She sent multiple texts (including numerous texts in April 2020) explaining that she had no credit, no money, and no resources to pay for necessary expenses, such as property taxes, child support at the risk of legal action, and a root canal that she had scheduled only an hour later.  Id.  Zhao responded — when he responded — by criticizing her money management and by telling her that he was too busy to speak with her.  Id.  Despite all of this, R.K. sent messages that called Zhao her best friend and treated him as such numerous times.  Id.  For example, on December 26, 2019, R.K. texted Zhao: "You have my life in your hands right now and it's very scary to not have any control.  It's almost 3am and I can't sleep.  I'm very worried about all of this stuff.  If this child support is not paid they can arrest me.  This is very scary. […]  You are my best friend, I totally trust you and need your help"; Zhao responded, in part: "U should pay them first before pay someone else.  [My partner] and I have use our personal fund over 40k to ur Musica marin last two months.  Now I m fighting for your donation misuse issue. […]  Please don't let these serious payments delay too long." (Bates MJZ-02311- MJZ-02313.)

The Superseding Indictment specifically charged two wires as to R.K. (which together represent only about 35% of the total amount R.K. gave to Zhao).

First, as part of her divorce, R.K. received half of her ex-husband's retirement savings (pension and 401k investments).  Id. at ¶ 19.  On August 28, 2018, her husband sent, via McGraw Hill (based in New York) and the Northern Trust Company (based in Chicago), a check for $760,720.52 to "Big Block Consulting Inc. FBO [R.K.]."  Id.  In an interview with the FBI, R.K. confirmed that the check "was part of her husband's retirement plan."  Id.  BBC's BOA account statement for September 2018 shows a counter credit for the same amount.  Id.  Contemporaneous text messages between R.K. and Zhao discuss the transfer of these funds:

8/21/2018
- **R.K.**: Can I get the account number for 401k?  Thanks!
- **ZHAO**: I forget to tell u it is 401570032018

8/24/2018
- **R.K.**: 401k all set.  Check will be there next week.  Thanks.
- **ZHAO**: Great I will keep u posted.  R u going to yacht club tonite?

9/6/18
- **R.K.**: Did you ever get the 401k check?  I'll call tomorrow if not.
- **ZHAO**: Just arrived today already posted in ur account.
- **R.K.**: Perfect!  Will chat with you next time about pension.  Hope your aunt is doing better.

*Id.*

Second, R.K., who was renting the bottom unit of her home to a tenant, passed along to Zhao a December 1, 2018, $6,000 from the tenant for rent covering January-March 2019 to add to the retirement account she believed he was managing for her. *Id.* at ¶ 20.  An image of the check reflects the tenant's address as a Maryland address and checking bank as Old Line Bank based out of Damascus, Maryland. *Id.*  R.K. advised law enforcement that, during that period, Zhao always suggested to her that she give him any money that she made to put into her "retirement" account with BBC. *Id.*  The December 2018 BBC BOA account reflects a deposit of $6,686.53, which includes the $6,000 check from the tenant. *Id.*  The deposited check image confirms this. *Id.*

On January 4, 2021, Zhao, using the same "BBCInvestment11@protonmail.com" email address (this time bearing the identifier "Jean Lim" with the title "Assistant Manager of Accounting"), also sent R.K. an investment annual report for 2019, which falsely showed that her money was invested in Sony Pictures, a satellite company, and US Large Cap Equity.  (*See* Bates MJZ-01589); *see also* PSR at ¶ 21. In reality, Zhao had used up all of R.K.'s funds by 2020.  *See* PSR at ¶ 21.

BBC's bank account, in addition to reflecting receipt of the above-described money from R.K., reflects that $336,516.00 was wired out of the account to pay for Zhao and his partner's Palm Springs Property (45635 Hopi Road, Indian Wells, CA). *Id.* at ¶ 22.  The FBI's financial tracing indicates that R.K.'s money paid for the residence in its entirety, *id*, and Zhao has agreed in the Plea Agreement to forfeit his interest in it, Plea Agreement ¶ 11(a).  In addition, a financial analysis of the BOA account shows that Zhao and his partner spent over $622,000 from the account to pay off Zhao's partner's Chase card. *Id.*  The vast majority of those funds were fraudulently obtained. *Id.*

In sum, out of the $2,167,512 that R.K. gave to Zhao, the FBI's analysis of the bank records reflects that Zhao returned to R.K. a total of $319,220, in the form of money paid to her, her nonprofit, and her ex-husband. *Id.* at ¶ 23.  That amounts to ~15% of the money that she gave him.  *Id.*  On the other hand, R.K.'s money represented 66% of money that was in the BBC BOA account, and nearly 19% of that money went solely to paying off Zhao's partner's credit card, not to mention other personal expenses.  *Id.*  By the Plea Agreement, Zhao has agreed that he owes $1,848,293 in restitution to R.K. to compensate her for his theft.  Plea Agreement ¶ 9.

### III.  CRIMINAL HISTORY

Zhao has a single conviction, but it is a significant one not only because the conduct was similar – Zhao, acting in the capacity of real estate professional, took down payments from nine of his clients and used those monies for his own benefit, PSR at ¶ 44 – but also because Zhao was on pretrial release in that matter when he took $300,000 from X.W. and over $50,000 from R.K., and made multiple misrepresentations to both in perpetuation of his scheme.

### IV.  SENTENCING GUIDELINES CALCULATIONS

The government agrees with the United States Probation Department's Sentencing Guidelines calculation.  *See* PSR at ¶ 69.  Specifically, the government agrees that the defendant's Adjusted Offense Level is 28, *id* at ¶ 37, but that his Total Offense level is 25, *id.* at ¶ 41.  This Total Offense Level includes increases for the substantial financial hardship R.K. experienced, discussed above and further in her Victim Impact Statement, and for Zhao's commission of new criminal conduct while on pretrial release.  *See id.* at ¶¶ 33 & 36.  This Total Offense Level also accounts for a three-level reduction pursuant to USSG §3E1.1(a)-(b) based on the defendant's Acceptance of Responsibility.  *Id.* at ¶¶ 39-40.  The government also agrees with Probation's finding that the defendant has 3 Criminal History Points, placing him in Criminal History Category II.  *Id.* at ¶ 45.  An Offense Level of 25 with a Criminal History Category II yields an advisory sentencing range of 63 to 78 months of imprisonment.  *Id.* at ¶ 69.

### V.  APPLICABLE LAW

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).  *United States v. Carty*, 520

F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id*. After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991–93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

(5) the need to provide restitution to any victims of the offense.

## VI. RECOMMENDATION

Based upon a consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a), the government respectfully recommends a sentence of 63 months of imprisonment followed by three years of supervised release. The Government further recommends that the Court find that this sentence should be concurrent with Zhao's remaining sentence in CR 19-00222-JD, pursuant to U.S.S.G. § 5G1.3(d). Probation joins in this recommendation. PSR Sentencing Recommendation at 2.

Mr. Zhao's conduct was egregious, and he did harm far beyond the $2 million he stole in this case. As R.K. explains in her Victim Impact Statement, the trauma caused to her by this multi-year experience, of being taken for everything she had by someone she thought was her "best friend," caused her to flee her "birthplace, [] friends, [] family, [] children, [] colleagues, [] familiar performing venues, and [] beautiful home, in an attempt to flee these awful thoughts and feelings of utter despair," and also broke her sense of trust. R.K. VIS at 3. Zhao has stolen from numerous people over the years, but a theft as intimate as the one he perpetrated on R.K. is shocking in its callous cruelty. It is the Government's view that his sentence in this case should not be less than 63 months.

At the same time, Zhao has admitted his crimes and accepted responsibility for them and for their financial consequences in his acceptance of forfeiture of the Hopi Road property and stipulated restitution figures. These concessions will allow the victims of his crimes to begin expeditiously the process of attempting to recoup something of what they have lost and to seek closure. Zhao has also agreed to an expanded search condition, which, given his recidivist history of perpetuating fraud schemes via electronic communications is reasonable and advisable and will help to deter future criminal conduct.

In short, a sentence of 63 months imprisonment (to be followed by three years of supervised release), forfeiture of the defendant's interest in the Hopi Road property, and restitution in the amounts of $35,210.93 for X.W. ad $1,848,293 for R.K., would be sufficient, but not greater than necessary, to reflect the purposes of sentencing based on the nature of the offense and the history and characteristics of the defendant.

### VII.   CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court impose a sentence of 63 months of imprisonment, followed by a 36-month term of supervised release, with each of the conditions recommended in the proposed Plea Agreement (including the expanded search condition), a forfeiture order as to the Hopi Road property, and restitution orders in the amounts of $35,210.93 for X.W. ad $1,848,293 for R.K. This sentence will not undo the harm wrought by Zhao; but it will begin the slow process of repairing it in addition to deterring him, following his release, from ever again meting out the kind of harm he has caused X.W. and R.K.

DATED:  April 12, 2023                                   Respectfully submitted,

                                                         ISMAIL J. RAMSEY
                                                         United States Attorney

                                                          /s/ *Alethea M. Sargent*
                                                         ALETHEA M. SARGENT
                                                         Assistant United States Attorney